UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CARL J. SERVAT, JR.                                        CIVIL ACTION

VERSUS                                                     NO.  04-2928

AMERICAN HERITAGE LIFE INSURANCE                          SECTION  "N"  (2)
COMPANY, ET AL

## ORDER AND REASONS

Presently before the Court are cross-motions for summary judgment concerning Plaintiff's entitlement to additional long-term disability insurance benefits.  (Rec. Doc. Nos. 12 and 13).[1]  As stated herein, **IT IS ORDERED** that Defendant's motion is **DENIED**.  Because the Court finds that Plaintiff is entitled to long-term disability benefits, attorney's fees, and costs, but is not able to determine the exact dollar amounts of these items, **IT IS FURTHER ORDERED** that Plaintiff's motion is **GRANTED IN PART** and **DENIED IN PART**.  As stated herein, the parties are instructed to provide additional submissions that will enable the Court to determine the appropriate dollar amounts of these awards and render a final judgment in this matter.

---

[1]      Defendant's motion for dismissal without prejudice for failure to exhaust administrative remedies (Rec. Doc. No. 13)  was converted, upon its oral motion in open court, to a cross-motion for summary judgment.  *See* Rec. Doc. No. 27.  Following oral argument, the parties supplemented their submissions.  Thereafter, recognizing the likelihood that the Court's ruling on the cross-motions for summary judgment would obviate the need for a trial, the parties asked that the trial be continued without date.  The Court granted this request. *See* Rec. Doc. No. 49.

## BACKGROUND[2]

In October 2002, Plaintiff was diagnosed with tonsil cancer. Following a tonsillectomy, Plaintiff underwent radiation therapy from December 2002 until mid-January 2003. Like most cancer patients receiving radiation treatment, Plaintiff suffered side effects that included weight loss, loss of taste, xerostomia,[3] and fatigue.

At the time of his cancer diagnosis and treatment, Plaintiff was employed as a full-time insurance enroller by Barnett & Associates. Through that employment, he was covered under disability insurance provided by Defendant. Pursuant to that coverage, Plaintiff received short-term disability benefits from November 2002, until mid-May 2003. As of May 17, 2003, he began receiving long-term disability benefits.

In early August 2003, Plaintiff's treating physician, Dr. Paul Monsour, a radiation oncologist, estimated that Plaintiff should be able to return to work in a few weeks. AHL 424. Thereafter, on September 30, 2003, Dr. Monsour released Plaintiff to commence part-time work, as of October 13, 2003, of no more than 20 hours per week. AHL 846, 848. Dr. Monsour noted that Plaintiff still suffered an element of fatigue that would preclude full-time work. *Id.* Because Plaintiff's salaried position at Barnett no longer was available, Plaintiff began part-time work as an independent, self-employed insurance producer on or about October 14, 2003. AHL 384, 830. He and Dr. Monsour informed Defendant of these part-time employment efforts later that month. AHL

---

[2]    In the interest of brevity, the Court will not quote at length from each and every relevant document in the administrative record. Rather, the Court will set forth facts essential to its analysis, and, where appropriate, reference pertinent documents from the administrative record. The Court additionally incorporates herein the Joint Time Line (Rec. Doc. No. 37) submitted by the parties.

[3]    Xerostomia is "dry mouth" resulting from an insufficient amount of saliva.

2

830, AHL 846.[4]

On October 30, 2003, Defendant's representative, Danielle Shoemaker ("Ms. Shoemaker"), informed Plaintiff, by letter, that his medical records were being sent "for an independent peer physician review to assist . . . in assessing [the] current limitations and restrictions precluding you from performing your occupation."  AHL 656.  Defendant received a report of that review, from Dr. Richard Bender, a California physician, on or about November 11, 2003.  AHL 595-96.  Thereafter, according to Ms. Shoemaker's notes of a November 18, 2003 telephone call, she informed Plaintiff that "'the physician review' felt that he should be at full-time work status by February [2004]," and that Defendant would  "pay him [benefits] through January 31st, either way." AHL 814.

Consistent with this November 2003 conversation, Ms. Shoemaker's February 3, 2004 letter to Plaintiff states that his last "Attending Physician Statement" had certified his disabled status through January 31, 2004.  AHL 784  The letter further advises:  "If you will not be returning to work due to your continued disability, we will need additional information to support your continued disability claim."  *Id.*  Specifically, Ms. Shoemaker's letter instructed that an updated "Attending Physician Statement" and medical records supporting continued disability would be necessary.  *Id.*

As Defendant's February 3, 2004 letter had forewarned, Defendant did not pay long-

---

[4]     The administrative record reveals that, in mid-to-late September 2003, Defendant's representatives questioned, and then sought to discover, whether Plaintiff had already returned to work.  AHL 734-35, 746-47, 751, 944.  Indeed, as will be discussed further in the analysis portion of this Order and Reasons, Defendant placed Plaintiff under surveillance for two days in an effort to ascertain his employment status.  AHL 746-47, 751.  The surveillance occurred on Monday and Tuesday, September 29-30, 2003.  AHL 374-83, 734-35.

term disability benefits to Plaintiff after January 31, 2004.  Plaintiff initially offered no objection to this termination of benefits.  On March 23, 2004, however, Plaintiff's treating physician, Dr. Monsour, wrote a letter to Defendant opining that, because of Plaintiff's continued xerostomia, fatigue, and concerns about the possibility of metastatic disease, "disability is in order."  AHL 475. Defendant responded that it would "review the request for continued long-term disability benefits" upon receipt of updated information and records.  AHL 339-40.

A new claim form and an "Attending Physician's Statement" were prepared by Plaintiff and Dr. Monsour, respectively, on April 19, 2004.  AHL 583-86.  These documents, like letters sent from Dr. Monsour to Dr. Joseph Creely, Jr., Plaintiff's ENT doctor, in June 2004, reference Plaintiff's continued fatigue and xerostomia, and their negative impact on his work ability. AHL 406-07, 473.  Dr. Monsour also emphasized that Plaintiff would continue to require monitoring for metastatic disease.  AHL 406-07, 473.

On June 23, 2004, Defendant's representative, Ms. Shoemaker, requisitioned a second "peer physician review to assist us in assessing current limitations and restrictions precluding [Plaintiff] from performing [his] occupation."  AHL 317, 392, 564.  Ms. Shoemaker instructed that the reviewing physician's evaluation was to utilize "evidence based medical principles," and that the report should "assess functional abilities based on [the] medical information provided."  AHL 392, 564.  The reviewing physician was also instructed to contact Plaintiff's treating physician, Dr. Monsour, by telephone.  *Id.*  On July 6, 2004, Defendant transmitted additional information subsequently received from Dr. Monsour to the reviewing physician.  AHL 563-64.

Defendant received the report prepared by Dr. David Endicott Gannett, a physician from Oregon, on or about July 12, 2004.  AHL 1112-19.  Two days later, on July 14, 2004,

Defendant, through Ms. Shoemaker, informed Plaintiff: "According to the [physician] review, there are no limitations or restrictions precluding you from performing the material and substantial duties of your occupation." AHL 332. Thus, "[w]e are unable to approve additional benefits, as you are not disabled as defined by your policy." AHL 333. Ms. Shoemaker's letter additionally advised Plaintiff that he had 60 days to appeal Defendant's denial of Plaintiff's claim for disability benefits.

On July 21, 2004, Plaintiff requested a copy of his administrative record, including the two peer physician reviews. AHL 127. Shortly thereafter, on July 27, 2007, Plaintiff appealed Defendant's denial of his claim for benefits. AHL 1122. In response, on August 2, 2004, Defendant, now through Janet Russell, informed Plaintiff of the receipt of Plaintiff's appeal letter. Ms. Russell also advised that Defendant had submitted the appeal and Plaintiff's records for a third peer physician review. AHL 315.

That same day, August 2, 2004, attorney John Fitzmorris, Jr., transmitted a letter on Plaintiff's behalf to Ms. Shoemaker. AHL 121-22. The letter notified Defendant of Mr. Fitzmorris's representation of Plaintiff, and requested information regarding the review of Plaintiff's claim that had occurred to date. *Id.* Plaintiff's counsel additionally advised that Plaintiff had retained a vocational rehabilitation specialist to review his functional capacity, and wanted to file the resulting report into the administrative record. *Id.* Finally, Mr. Fitzmorris advised that Plaintiff was in the process of asking Dr. Monsour to respond to the (second) peer physician evaluation. *Id.*

On August 13, 2004, Defendant received a report from Dr. James Wortman, a physician in North Carolina, who had conducted the third physician review of Plaintiff's file. AHL 299-302. According to the report, Dr. Wortman's review included consideration of certain documents and a telephone conversation with Dr. Monsour. *Id.* Dr. Wortman opined: "Based on

the clinical information provided, there are only minimal current restrictions and limitations, none of which would prevent this claimant from performing his occupation in sales." *Id.* Following receipt of that report, Defendant notified Plaintiff, on August 18, 2004, that it had completed its review of his July 27, 2004 appeal, and had determined that Plaintiff was not disabled as defined by the policy. AHL 298. Accordingly, the claim was denied. Defendant reasoned: "According to the information provided, Mr. Servat has minimal limitations and restrictions, none of which preclude him from performing the material and substantial duties of his occupation in Sales." *Id.*

Thereafter, on or about September 1, 2004, Plaintiff's counsel transmitted to Defendant, as he previously had indicated that he would, an August 5, 2004 letter from Dr. Monsour, and an August 26, 2004 report of a "Functional Capacity Evaluation" conducted by Ms. Susan Smith, MA, LOTR, FAOTA. AHL 1266-85. Plaintiff's counsel's accompanying letter contends that the opinions reflected in these documents clearly establish Plaintiff's disability and render Defendant's reliance on the peer review physicians arbitrary and capricious. *Id.* The letter further requests reinstatement of benefits and payment of the amount in arrears. *Id.*

In short, Dr. Monsour's August 5, 2004 letter, among other things, confirms that Plaintiff continued to suffer from xerostomia as a result of his radiation, and indicates that Plaintiff "also has extreme fatigue, disabling him and preventing him from doing his normal daily activities without prolonged periods of rest for the foreseeable future." AHL 1266. Ms. Smith's report reflects that she had Plaintiff complete a series of physical tasks over 2-3 hour period, which, though he was physically capable of performing each of the tasks, resulted in his progressive fatigue. AHL 1267-85. She concludes that the combination of fatigue and xerostomia renders him presently unable to meet the demands of his work, and indicates that the xerostomia alone prevented him from fulfilling

6

the speaking requirements of his job.  AHL1273.   Noting that Plaintiff has reported some positive progress with his fatigue, albeit slow, Ms. Smith states that she anticipates future recovery of his normal energy level. *Id.*

Responding to Plaintiff's counsel's September 1, 2004 submission on September 15, 2004, Defendant, through Ms. Russell, informed Plaintiff's counsel that counsel's letter and the enclosures had been forwarded to Rachel Khalili for review and response.  AHL 295.   On September 21, 2004, Defendant requested Plaintiff's medical records for September 2002 to the present from his ENT doctor, Dr. Creely.  AHL 278.  On September 29, 2004, Defendant sought a copy of Plaintiff's job description from his former employer, Barnett & Associates, which was provided the next day.  AHL 348, 351-52.   On or around October 1, 2004, Defendant provided the Smith report, certain background information, and three questions to Mr. Robert Violetta, MS, CRC, CDMS, for an "independent vocational assessment." AHL 126.

On October 4, 2004, Plaintiff's counsel inquired of the status of Plaintiff's claim, noting that it had been under Ms. Khalili's review for nearly three weeks, and threatened legal action in the absence of a response within the next five days.  AHL 124.   Responding by facsimile and U.S. Mail, on October 5, 2004, Ms. Khalili explained that the Smith report had been referred for independent vocational assessment.  AHL 126.  She then continued:  "Upon completion of this review, we will forward all documents for a final independent physician review.  Should it be necessary, as part of this review process, we will arrange a medical exam of Mr. Servat." *Id.*   She also requested documentation and information regarding any claim made by Plaintiff for Social Security disability income, and assured that the appeal review process would be completed as soon as possible.  *Id.*

In reply, that same day, Plaintiff's counsel, by facsimile, advised that Plaintiff had not sought disability benefits from the Social Security Administration. AHL-098. He further stated: "While we are appreciative of your need for a so-called 'independent FTC evaluatio[n],' we must object to any further medical evaluations of Mr. Servat. Allstate[5] has had his records evaluated by two out-of-state physicians and this is sufficient." *Id.* Plaintiff's counsel concluded by stating that appropriate action would be taken on October 21, 2004, if a decision had not been received by that date. *Id.*

Defendant, through Ms. Khalili, provided the requested decision on October 15, 2004. AHL-93-95. Specifically, Ms. Khalili reiterated that Plaintiff's file and the Smith "Functional Capacity Evaluation" had been referred for an independent vocational assessment, and stated: "Pending its completion, if indicated, we will arrange for an independent medical examination." *Id.* at 94. Continuing, Ms. Khalili explained that Defendant had re-opened Plaintiff's claim for reconsideration based upon counsel's September 1, 2004 letter, and the accompanying Monsour letter and Smith report. *Id.* According to Ms. Khalili, "[that] reconsideration process includes, but is not limited to, a vocational assessment and independent medical examination. *Id.* Noting Plaintiff's objection to "further medical evaluations," Ms. Khalili concluded: "[Y]ou have left us no option but to discontinue the review process and close Mr. Servat's file. As we did not complete our review, we must advise our decision regarding Mr. Servat's claim remains unchanged. If we have misunderstood your position, please advise and we will reopen the file and continue the review process." *Id.*

---

[5]    Various documents in the administrative record identify "Allstate Workplace Division" as a marketing name for American Heritage Life Insurance Company, which, in turn, is identified as a wholly-owned subsidiary of The Allstate Corporation. *See, e.g.,* AHL583-86.

On October 26, 2004, Mr. Violetta provided his vocational assessment report to Defendant. AHL 268-77.[6]  In response to Defendant's specified referral issues, Mr Violetta identified Plaintiff's occupation as corresponding to Insurance Agent DOT#250.257-101, existing at a "light" exertion level ("lifting carrying, pushing, pulling up to 20 pounds occasionally, 10 pounds frequently and/or standing/walking exceeding occasional in a workday"), and typically requiring "constant talking and hearing; and frequent reaching, handling, fingering and near acuity." AHL 273.

Regarding the Smith "Functional Capacity Evaluation," Mr. Violetta did not find it consistent, at least with respect to the exertional capability for lifting and carrying, with the earlier surveillance report. *Id.* Mr. Violetta also opined that some of the methodology and certain of the sub-tests attempted to assess physical capabilities not actually required for Plaintiff's occupation. *Id.* Given these considerations, Mr. Violetta indicated that it was not clear to him that Plaintiff could not sustain at least "sedentary" work on a full-time basis. *Id.* According to Mr. Violetta, however, Plaintiff's xerostomia, if confirmed and not manageable via use of bottled water, would itself "preclude[] [Plaintiff] from performing his occupation because it requires constant speaking throughout the workday." AHL 274-75.

Mr. Violetta recommended that the Smith evaluation's "methodology and findings be reviewed by a physical therapist, occupational therapist, or physiatrist[7] for further commentary on reliability." *Id.* at 274. He also stated that Defendant "may also wish to consider a Functional

---

[6]     Despite Ms. Khalili's October 15, 2004 letter, indicating that it was discontinuing the review process and closing Mr. Servat's file,  Defendant apparently did not instruct Mr. Violetta to forego his review.

[7]     A physiatrist is a physician specializing in physical medicine. *See* Webster's Third New International Dictionary (1967).

Capacity Evaluation as part of an Independent Medical Examination to establish Mr. Servat's work capacity more clearly. Both should incorporate clinical observation particularly with reference to Mr. Servat's xerostomia." *Id.* [8]

In sum, based on the determinations by Dr. Monsour, Ms. Smith, and Dr. Gannet, the second of the peer review physicians, that Plaintiff should avoid speaking for a prolonged period of time, Mr. Violetta opined that Mr. Servat is incapable of performing his own occupation as it requires constant speaking throughout the workday. *Id.* He qualified this determination, however, by stating that "the findings of an IME/FCE with clinical observation might cause me to alter my opinion." *Id.*

Following receipt of the Violetta report, Defendant apparently took no further action regarding Plaintiff's claim. In any event, it did not reinstate benefits. Accordingly, on October 27, 2004, Plaintiff filed this suit.

As explained in footnote 1 of this Order and Reasons, Defendant initially sought dismissal of the action without prejudice on grounds of failure to exhaust administrative remedies. Specifically, Defendant urged that this legal action is premature unless and until Plaintiff submitted to the requested independent medical examination, and Defendant thereafter made a further assessment of Plaintiff's claim, as supported by his attorney's September 1, 2004 letter, and the accompanying August 5, 2004 Monsour letter and August 26, 2004 Smith report. According to Defendant, Plaintiff had not allowed it to "fully investigate his condition." *See* Memorandum in Support of American Heritage's Motion to Dismiss For Failure to Exhaust Administrative Remedies (Rec. Doc. No. 13) at 10. Once Plaintiff returned to full-time work, however, in July 12, 2005, the

---

[8]     Mr. Violetta notes that both Ms. Smith and Dr. Monsour have clinically observed Plaintiff's xerostomia. AHL 274.

Court, at Defendant's request, converted its motion to one seeking summary judgment. *See* Rec. Doc. No. 27.   Thus, the Court is presented with cross motions for summary judgment.

## LAW AND ANALYSIS

Pursuant to Rule 56 (c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c).  The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986);  *see also Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S. Ct. 2553;  *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986);  *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir. 2001).

11

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th

12

Cir. 2002).

I.      **Plaintiff's Claim for Long-Term Disability Benefits**

      A.      **The Parties' Arguments**

             Plaintiff's motion for summary judgment seeks a finding that Defendant's claim determinations in January 2004, and then in July, August, and October 2004, were arbitrary and capricious.  In addition, Plaintiff requests an order requiring reinstatement of long-term disability benefits in the amount of $1,800 per month and payment of $32,400 in back benefits.[9]  Defendant's cross-motion seeks a finding that its decisions were supported by concrete evidence in the administrative record and, therefore, not arbitrary and capricious.  It further argues that, given Plaintiff's subsequent return to work, his earlier refusal to submit to an independent medical examination denied Defendant the opportunity to "fully investigate" Plaintiff's disability claim.  Accordingly, Defendant maintains that the Court's review should be limited to whether Defendant arbitrarily and capriciously denied benefits on August 18, 2004, and should consider only the information and documents found in the administrative record as of that date.  Essentially, Defendant contends that the opinions of its three reviewing physicians provide sufficient evidence to support its adverse determinations of Plaintiff's claim for long-term disability benefits.

      B.      **Analysis**

             There is no dispute that Plaintiff's claim is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.*  As explained by the Fifth Circuit, in *Lain v. UNUM Life Ins. Co. of Am.,* 279 F.3d 337, 343 (5th Cir. 2002), "[i]n assessing whether

---

[9]      This is the request for relief set forth on the first page of Plaintiff's motion for summary judgment (Rec. Doc. No. 12).  His supporting memorandum, however, requests an award of two years of monthly benefits of $1,800 for a total award of $43,200.  Plaintiff also seeks an award of costs and attorney fees, which are addressed separately below.

to grant or deny benefits [under an ERISA plan], an administrator must make two determinations. First, he must determine the facts underlying the claim presented and then he must determine whether the facts establish a claim to be honored under the terms of the policy."

Thereafter, a denial of a claim for benefits under ERISA "is to be reviewed [by the Court] under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . ."  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S. Ct. 948 (1989).  Regardless of the authority to determine eligibility or construe the plan, however, factual determinations made as a part of a benefits review are always reviewed only for an abuse of discretion.  *Meditrust Fin. Servs. Corp. v. Sterling,* 168 F.3d 211, 213 (5th Cir. 1999).  Here, it is undisputed that Plaintiff's disability insurance policy gives Defendant discretion "to determine all questions arising in connection with the policy's benefit, including but not limited to eligibility, beneficiaries, interpretation of Policy language, and findings of fact with regard to any such questions."[10]

Regarding the application of the abuse of discretion standard, this Court, in *Needham v. Tenet Select Benefit Plan*, No. 02-3291, 2004 WL 193131 (E.D. La. Jan. 30, 2004), explained:

> When applying the abuse of discretion standard, the Court's task is to determine whether the administrator acted arbitrarily or capriciously.  *Id.*  "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence.'"  *Id.* (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 828 (5th Cir.1996)).  Thus, an "administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.'"  *Id.* (quoting *Vega* [ *v. Nat'l Life Ins. Servs., Inc.*,188 F.3d 287, 299 (5th Cir. 1999)]).  The Court owes no deference to an administrator's "unsupported suspicions" and will not uphold the denial of a claim "solely because an administrator

---

[10]      AHL 032.

suspects something may be awry." *Vega*, 188 F.3d at 302.  Simply put, there must be "some concrete evidence in the administrative record that supports the denial of the claim." *Id.*  If there is none, the Court must find that " 'the administrator abused its discretion.'" *Lain*, 279 F.3d at 342 (quoting *Vega*, 188 F.3d at 302).

This standard of review is somewhat less deferential where . . . the administrator is operating under a conflict of interest.  Here, it is undisputed that UNUM is both the party charged with determining whether claims for long-term benefits will be approved and the insurer responsible for paying claims that are approved.  Such administrators "ha[ve] a financial incentive to deny the claim and often can find a reason to do so." *Vega*, 188 F.3d at 296.  This creates a conflict of interest . . . .[11]  The Fifth Circuit has adopted a "sliding scale" standard of review for such cases. *Vega*, 188 F.3d at 296.  Using this sliding scale approach, "the court always applies the abuse of discretion standard, but gives less deference to the administrator in proportion to the administrator's apparent conflict." *Id.*  For example, where an administrator is conflicted, the Court will be "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Id.* at 299.

As in *Needham*, Defendant is responsible for determining whether Plaintiff is entitled to long-term

disability benefits and, if so, for paying those benefits.  Accordingly, the Court applies a "sliding

scale" abuse of discretion standard of review.

1.   __January 2004 Termination of Benefits__

Based on the information then known to Defendant, the Court finds no abuse of

discretion with respect to its decision, in late 2003/early 2004, to terminate Plaintiff's long-term

benefits as of January 31, 2004.  In mid-November 2003, Defendant had received a report from Dr.

---

[11]     As the Fifth Circuit explained in *Vega*, "there are two ways employee benefit plans may be created: (1) the employer funds the program and either contracts with a third party who administers the plan or provides for administration by a trustee, individual, committee, or the like; or (2) the employer contracts with a third party that both insures and administers the plan." *Vega*, 188 F.3d at 295.  "In the latter situation, the administrator of the plan is self-interested, *i.e.*, the administrator potentially benefits from every denied claim." *Id.*

Bender, the first physician retained by Defendant to offer an opinion regarding Plaintiff's recovery, as well as any restrictions that would preclude him from returning to his insurance sales position. AHL 595-96.  Although not without grounds for criticism, the report indicates that, absent "clinical information to the contrary," full recovery from radiation therapy, including return to full-time work, is expected within a year of the completion of such therapy.  *Id.*

Further, Plaintiff's treating physician, Dr. Monsour, had approved Plaintiff's resumption of work on a part-time basis (20 hours per week) as of October 13, 2003, noted his progressing recovery, and expressed hope that Plaintiff's continued fatigue would improve with time.  AHL 495, 848.  Significantly, moreover, the record reflects no objection or effort by Plaintiff to prevent the termination of benefits when he was informed, on November 18, 2003, of the reviewing physician's expectation that should be able to return to full-time work status by February 2004.  AHL 814.  Finally, even if Plaintiff mistakenly believed, in November 2003, that he would be capable of full-time work by the end of January 2004, but then discovered otherwise, the record likewise does not reflect that, prior to March 23, 2004, he or his physician provided the updated information that Defendant's February 3, 2004 letter indicated would be necessary to certify his disability status beyond January 31, 2004, or otherwise protested the termination of benefits as of that date.  AHL 784.  Thus, at the time Defendant's decision to terminate Plaintiff's benefits as of January 31, 2004, was made, it bore a rational connection to the information then known to Defendant.  Hence, no abuse of discretion occurred.

### 2.    July, August, and October 2004 Denials of Benefits

As previously recounted, Plaintiff ultimately asked, in March and April 2004, that Defendant resume payment of long-term disability benefits.  AHL 339-40, 475, 583-86.  According

to Plaintiff, his continued fatigue and xerostomia rendered him unable to continue working on even a part-time basis.  AHL 475, 583-86.  Defendant denied this claim on July 14, August 18, and October 15, 2004.  AHL 94-95, 297-98, 332-34.

As a preliminary matter, the Court, in reviewing these decisions, declines Defendant's request to limit its consideration to only the information existing in the administrative record as of August 18, 2004.   In other words, the Court will not disregard Dr. Monsour's August 5, 2004 letter and Ms. Smith's August 26, 2004 functional capacity evaluation report simply because Plaintiff informed Defendant, on October 5, 2004, that he objected to undergoing an independent medical examination.  The reasons for this determination will be discussed herein.  In any event, as will be discussed, the Court finds that Defendant's denial of Plaintiff's renewed claim for benefits was arbitrary and capricious whether the entirety of the administrative record is considered or, instead, whether the Court considers only the information existing in the record as of August 18, 2004.

Relative to the Court's review of the denial of Plaintiff's claim for disability benefits, Defendant's disability policy provides, in pertinent part:

### LONG TERM DISABILITY PLAN

* * *

### DEFINITION OF DISABILITY

During the elimination period and the first 24 months of disability payments, the **employee** is disabled when American Heritage Life determines that:

1. **he** is unable to perform the material and substantial duties of his **regular occupation** due to his **sickness** or **injury**; and

2. **he** has a 20% or more loss in his monthly earnings due to the same sickness or injury.

After the first 24 months of disability payments the **employee** is disabled if **he** is:

1. not working, and due to the same **sickness** or **injury**, he is unable to perform the duties of any **gainful occupation** for which **he** is reasonably fitted by education, training or experience; or

2. working in any occupation and continues to have a 20% or more loss in **monthly earnings** due to **sickness** or **injury**.

* * *

**We** may require the **employee** to be examined by a **doctor**, other medical practitioner, or vocational expert of our choice.  American Heritage Life will pay for this examination.  **We** can require an examination as often as it is reasonable to do so.  **We** may also require the **employee** to be interviewed by an authorized American Heritage Life representative.[12]

* * *

**SICKNESS**   means an illness or disease.  Disability must begin while  the **employee** is insured under this policy.[13]

**MATERIAL AND SUBSTANTIAL DUTIES** means duties that:

1. are normally required for the performance of the **employee's regular occupation**; and

2. cannot be reasonably omitted or modified, except that if he is required to work on average in excess of 40 hours per week, American Heritage Life will consider him able to perform that requirement if he is working or has the capacity to work 40 hours per week.[14]

---

[12]       AHL 024.

[13]       AHL 035.

[14]       AHL 034.

**REGULAR OCCUPATION** means the occupation the **employee** was routinely performing when his disability begins.[15]

\* \* \*

## PROOF OF CLAIM

Proof of claim, provided at the **employee's** expense, must show:

1. that he is under the **regular care** of a **doctor**; and
2. the date his disability began; and
3. the cause of his disability; and
4. the extent of his disability, including restrictions and limitations preventing him from performing his **regular occupation**; and
5. the name and address of any **hospital or institution** where he received treatment, including all attending **doctors;** and
6. the appropriate documentation of his **monthly earnings**.[16]

\* \* \*

## CLAIM REVIEW

If the employee's claim is denied, he will be given written notice of:

1. the reason for denial; and
2. the policy provision that relates to the denial; and
3. his right to ask for a review of his claim; and
4. any additional information that might allow **us** to change our decision.[17]

## APPEALS PROCEDURE

Prior to filing any lawsuit and within 60 days after denial of a claim, the **employee** or his beneficiary must appeal any denial of benefits under the policy by making a written request for review of the denial.[18]

---

[15]   AHL 035.

[16]   AHL 031

[17]   AHL 032

[18]   AHL 032.

a.     July 14, 2004 Claim Denial

On July 14, 2004, Defendant notified Plaintiff of its initial denial of his renewed request for disability benefits. AHL 332-34. Consideration of that notice reveals that Defendant's decision rested, in large part, on the peer physician review report prepared by Dr. Gannet, on July 12, 2004, wherein he opined that there were no restrictions on Plaintiff's ability to work, other than to avoid prolonged speaking and to have drinking water at all times. *Id.* Dr. Gannet's evaluation, like the one conducted by Dr. Bender, in November 1, 2003, and by Dr. Wortman in August 2004, did not involve an in-person examination of Plaintiff. Rather, Dr. Gannet's opinion was formulated based on his consideration of the documentary evidence provided to him by Defendant and a conversation with Dr. Monsour regarding Plaintiff's condition. AHL 1112-19. Dr. Gannet's report reflects that he was provided with, and considered, various physician progress notes, lab/test results, the earlier report prepared by Dr. Bender, the report of the October 2003 surveillance of Plaintiff, and other unspecified, "miscellaneous" documents.[19]  *Id.* at AHL 1112.

In his report, Dr. Gannet agrees with Dr. Bender that disabling fatigue associated with radiation therapy typically should not last more than a year following the completion of that treatment. Significantly, however, neither doctor indicates that such fatigue could *never* last beyond a one-year period. AHL 1115. Rather, Dr. Gannet emphasizes the lack of an "objective cause" for continued physical or mental fatigue, and the lack of "objective evidence" in Plaintiff's records supporting any work restrictions or limitations relative to fatigue. *Id.* at 1114-15. Dr. Gannet also reports that Dr. Monsour did not have an opinion as to the etiology of Plaintiff's continued fatigue

---

[19]     As Defendant urges, a treating physician's determination of a plaintiff's medical condition is not entitled to deference over that of a non-treating physician. Nor is an actual medical examination, as opposed to a file review, necessarily required. Nevertheless, the Court is entitled to consider the nature and extent of the information each physician had before him in formulating his professional opinion.

and difficulty. *Id.* at 1113.  He further reasons that the report of Defendant's September 29-30, 2003 video surveillance, showing Plaintiff putting a removable seat back into his SUV, and, with the help of another man, lifting two heavy boxes, provides objective findings that are inconsistent with Plaintiff's subjective complaints of disabling physical and mental fatigue.  *Id.* at 1114.  Finally, regarding Plaintiff's xerostomia, Dr. Gannet suggests that Plaintiff should avoid prolonged speaking, carry drinking water at all times, and participate in an aggressive dental prophylaxis program. *Id.* at 11114-16.

        Although the Court in no way doubts Dr. Gannet's credentials or expertise, the Court, for several related reasons, does not find that his report, even considered together with the other information known at that time, provided sufficient support for Defendant's determination that "there are no limitation or restrictions precluding [Plaintiff] from performing the material and substantial duties of [his] occupation." AHL-332.   Accordingly, as will be explained further, the Court does not find that Defendant's July 14, 2004 denial of Plaintiff's claim was based on evidence that clearly supports the basis for the denial.

        As an initial matter, relative to Plaintiff's complaints of severe fatigue,  Dr. Gannet's report emphasizes that Plaintiff's medical records and treating physician's reports do not reflect an "objective cause" for, or "objective medical evidence"of, those complaints.  AHL 1114-15.  While that may be true, Defendant does not point to any provision in its disability policy specifying that *objective* evidence of all covered disabling conditions is required.  Furthermore, whether or not someone suffers from fatigue, as well as the specific cause of that fatigue, unlike some medical conditions, typically would *not* be revealed by ordinary laboratory test results or other routine, objective medical findings. *Cf. Karvelis v. Reliance Std. Life Ins. Co.*, Civil Action No. H-03-3848, 2005 WL 1801943, *12-15, 18-20 (S. D. Tex. July 28, 2005) (discussing objective evidence

requirements relative to chronic fatigue syndrome).  Rather, a diagnosis of the cause of fatigue in many cases will be one of exclusion.  *Id.*

On the other hand, it typically *is* possible to obtain objective evidence of the *symptoms* of fatigue and of their *effect* on a person's ability to work.  *Id.* at 15.  This is what Plaintiff's counsel, once retained,[20] sought to provide to Defendant when he referred Plaintiff to Ms. Smith for a functional capacity evaluation in August 2004.[21]  Although such assessments presumably may sometimes be warranted in the ordinary course of certain types of medical treatments, this is not true for every patient.  Thus, the absence of such evidence in a disability claimant's *medical* records should not necessarily be prohibitive of his claim.  Rather, the nature of the particular disability at issue, as well as the specificity and clarity of the proof of claim requirements in the relevant insurance provisions, must be considered in evaluating a claim for benefits.

Here, relative to Defendant's July 14, 2004 denial, Dr. Monsour's April 19, 2004 "Attending Physician's Statement," which was submitted in support of Plaintiff's renewed claim for disability benefits, as well as Dr. Monsour's March 23, 2004, and June 1 and 22, 2004 letters, continues to report work-prohibitive fatigue and xerostomia.  AHL 406, 473, 475, 585.  While Dr. Monsour did not have the benefit of the results of a functional capacity assessment before him, which presumably would have provided some objective evidence of Plaintiff's symptoms, he nevertheless apparently believed that Plaintiff in fact suffered debilitating fatigue.  Moreover, he

---

[20]     There is no indication in the record that Plaintiff retained the services of counsel before August 2, 2004.  AHL 121-22.

[21]     As explained above, Ms. Smith sought to evaluate Plaintiff's progressive fatigue as he completed a series of physical tasks over a two to three hours period.  AHL 1267-85.

agreed with Plaintiff's attribution of that fatigue to his cancer treatment and recovery.[22]  AHL 406, 473, 475, 495, 585, 846, 850.  Although this determination turned, at least in part, on Plaintiff's subjective reports of severe fatigue, physicians frequently must make such credibility determinations about their patients' complaints and, furthermore, rely on subjective assertions in determining an appropriate course of treatment.[23]  That apparently was the case here, as Dr. Monsour reported that he hoped Plaintiff's fatigue would improve with time.   AHL 406, 475, 495.

The Court also finds Dr. Gannet's and, thus, Defendant's, substantial reliance on the September 29-30, 2003 surveillance of Plaintiff, in rejecting Plaintiff's and Dr. Monsour's assessment of Plaintiff's work capabilities, problematic.  First, as indicated in Plaintiff's various claim documents, and later emphasized in his July 27, 2004 appeal letter, Plaintiff's claimed disability is that of severe fatigue existing *"after several hours of exertion."*  AHL 257, 258, 406, 473, 475, 495, 583, 585-86, 846, 848, 850, 857, 1122.  In other words, Plaintiff does not complain that he was completely incapable of any strenuous activity at all, or of performing any and all activities of daily life.  Instead, the focus of his disability claim is that he could not *sustain* over time the requisite level of activity necessary to satisfy the material and substantial duties of his regular

---

[22]   As recounted above, Dr. Gannet's report indicates that "Dr. Monsour did not have an opinion as to the etiology of Mr. Servat's continued fatigue and mental difficulty."  AHL1113.   Dr. Monsour's written reports, however, to both Defendant and, significantly, the doctor who performed Plaintiff's surgery, Dr. Creely, repeatedly attribute Plaintiff's complaints of fatigue to his cancer treatment and recovery.  AHL 406, 407, 473, 475, 585, 846, 848, 850.  Thus, the Court understands this alleged verbal statement by Dr. Monsour to mean that he could not identify a particular reason why Plaintiff continued to suffer from the side effects of radiation treatment for a longer period of time than typically is expected.

[23]   Defendant does not argue that Dr. Monsour did not provide appropriate initial or follow-up medical care to Plaintiff.   Thus, the Court will not assume that Dr.  Monsour should have, but did not, order certain laboratory or other medical testing that would have revealed an alternative, non-covered cause of Plaintiff's complaints of fatigue.

23

occupation.  AHL 257, 258, 406, 473, 475, 495, 583, 585-86, 846, 848, 850, 857, 1122.

Defendant's surveillance of Plaintiff, however, did not document Plaintiff's energy level over time and whether it was sufficient enough to allow Plaintiff to satisfy his work duties. Indeed, that was never the intended purpose of the surveillance.  To the contrary, Defendant's records reflect that two days of surveillance were ordered to determine if Plaintiff, unbeknownst to Defendant, had already returned to work at that time.  AHL 746-47, 751, 944.  Further, although verification of work status was indicated in Defendant's "request for services" as the focus of the surveillance, the investigators' comments reveal that they apparently mistakenly believed its purpose was merely to establish Plaintiff's ability to drive, to lift, and to stand, move, and walk freely and easily, and without any means of aid or support.   AHL 374, 378, 381, 734, 751.

Even more important, the surveillance occurred for only two days, and from only 6:00 a.m., until 2:00 p.m., each day.  AHL 374-383.  Further, the investigators  recorded a total of only 13 minutes and 14 seconds of activity the first day and 5 minutes and 24 seconds of activity the second.  *Id.*  As Plaintiff has pointed out, his ability to spend less than an hour running a few errands and then, after a couple hours inside his residence, to spend approximately *five* minutes assisting another person in moving two seemingly heavy boxes, followed by less than *two* minutes replacing removable seats in his SUV, hardly demonstrates an ability to consistently satisfy the demands of his regular, full-time occupation in insurance sales.  Thus, the Court finds Dr. Gannet's characterization of the surveillance as providing objective findings inconsistent with Plaintiff's subjective complaints of disabling fatigue to be an overstatement, as well as an insufficient basis for determining that Plaintiff did not suffer limitations and restrictions precluding satisfaction of the material and substantial duties of his regular occupation.  AHL 1114.

The Court similarly finds questionable Dr. Gannet's apparent use of the surveillance

24

report to prepare the "Estimation of Physical Capabilities" section of his report, which is used to reflect "judgments regarding the insured's ability to perform work-related activities." AHL1117-18. The form seeks assessments of the patient's ability to perform and sustain various activities, at different frequency levels, over an eight-hour workday. *Id.* For each category, Dr. Gannet, apparently relying primarily on the surveillance report[24] and normal lab results, concludes that Plaintiff could perform all of the activities throughout an eight-hour work day, including lifting 100 pounds and frequently lifting/carrying 50 pounds, without any other limitations on the frequency of the activity during that time. *Id.* While it might be fair to conclude that Plaintiff could perform all of the listed activities at *some* unspecified level of frequency throughout an 8-hour workday, the propriety of the "glowing" report of Plaintiff's physical capacities rendered by Dr. Gannet has not been demonstrated, and is far from facially apparent from a review of the administrative record. *Id.* Consequently, it likewise cannot be viewed as a sufficient basis for Defendant's blanket rejection of Plaintiff's complaints of disabling fatigue.

Turning to Plaintiff's complaints of xerostomia, Defendant's denial of Plaintiff's claim is even more troublesome when that aspect of the claim is considered. Unlike with Plaintiff's fatigue, Dr. Gannet does not question the existence of his xerostomia.[25] Rather, he notes evidence indicating that Plaintiff could converse normally, in complete sentences, for a *short* period of time as long as he was also sipping water. AHL1113-15. Significantly, however, he further acknowledges: "Mr. Servat would be expected to have some difficulty with functioning with regard to speaking for

---

[24]   Given Dr. Gannet's reference of the "surveillance report," it is not clear whether he actually viewed the surveillance video or instead reviewed only the investigator's report. AHL 1118.

[25]   It is undisputed by the parties that the existence of xerostomia is ascertainable upon physical examination. Indeed, Dr. Gannet indicates that Plaintiff's medical records have objective evidence of his xerostomia. AHL 1115.

*prolonged* periods of time," which "may affect his line of work as an insurance salesman."  AHL

1114 (emphasis added).  Thus, he recommends a restriction of "avoid[ing] periods of prolonged

speaking," continuing with dental care, and carrying drinking water at all times. *Id.*

    Despite Dr. Gannet's acknowledgment of the adverse effect that Plaintiff's xerostomia

would likely have on his ability to perform his insurance sales job, in addition to Plaintiff's and Dr.

Monsour's repeated assertions of continuing xerostomia and its effects, Defendant's July 14, 2004

denial letter offers no discussion of this issue.  AHL 332-33, 1114.  Rather, it simply references Dr.

Gannet's review as determining that there are "no limitations or restrictions that would preclude

performance of the material and substantial duties of Plaintiff's regular occupation," and, for that

reason, denies Plaintiff's claim.  AHL 332-33.  Significantly, Defendant cites nothing to evidence that

it, having considered the relevant duties of Plaintiff's regular occupation, had a rational basis for

rejecting the notion that Plaintiff's xerostomia, because it prevented him from speaking for prolonged

periods, would preclude him from performing his regular insurance sales occupation.[26]  AHL 258,

---

[26] Under the provisions of Defendant's policy, Plaintiff's disability status, as of July 14, 2004, turned on his ability to perform the material and substantial duties of *his* regular occupation, rather than just any gainful occupation.  AHL 027.  Significantly, the administrative record does not expressly reflect that Defendant provided any information identifying and describing these duties to any of its three reviewing physicians.  Moreover, the record reveals that, *at the end of September 2004*, after *twice* denying Plaintiff's claim, Defendant requested a description of certain aspects of Plaintiff's job duties as an "enroller" from his former employer, Barnett & Associates.  AHL 348, 351-52.  Additionally, at that time, or in early October 2004, Defendant sought clarification from Mr. Violetta, a vocational consultant, as to whether the duties outlined by Barnett for Plaintiff's position as an "enroller" corresponded to the DOT description for that occupation.  AHL 273-74, 1227.

  In any event, there is no real dispute that during the relevant time period, Plaintiff was employed on a full-time basis, and that he enrolled persons who wished to purchase insurance.  It also is undisputed that his job duties included preparing for and participating in meetings with and/or presentations to potential enrollees, traveling when necessary, and conversing at length with potential enrollees to provide and obtain pertinent information.  According to the job description submitted by Barnett, on or around September 30, 2004, Plaintiff traveled out-of-town (by car or by plane) once or twice a month, on average, for enrollments.  AHL 348.

406, 473, 475, 583, 585.   Indeed, it seems that Defendant focused on the parts of Dr. Gannet's report relative to fatigue, which it liked, while essentially ignoring his negative treatment of Plaintiff's complaints of xerostomia.   In any event, given the non-specific reasons for denial offered in Defendant's July 14, 2004 letter, and the absence of a citation of other clarifying discussion of the issue in the administrative record, the Court does not find sufficient evidentiary support for Defendant's rejection of Plaintiff's claim of disabling xerostomia.

### b.   August 18, 2004 Claim Denial

As explained in the background portion of this Order and Reasons, Plaintiff, after receiving Defendant's July 14, 2004 denial letter, requested a copy of the administrative record of his claim review on July 21, 2004.   AHL127.   He then submitted a letter of appeal on July 27, 2004.   AHL 1122.   In response, Defendant, on August 2, 2004, solicited a *third* peer physician review of Plaintiff's medical records, his appeal letter, the Attending Physician's Statement and Plaintiff's claim form.   AHL 315, 560, 843.   The third reviewing physician, Dr. Wortman, was also instructed to contact Plaintiff's treating physician, Dr. Monsour.   AHL 560.

Following receipt, on or around August 13, 2004, of the report of the third peer physician review, Defendant denied Plaintiff's appeal on August 18, 2004.   AHL 297-98.   To explain its determination that Plaintiff was not disabled, Defendant references the physician review and essentially quotes from the report:  "According to the information provided, Mr. Servat has minimal limitations and restrictions, none of which preclude him from performing the material and substantial duties of his occupation in Sales."   AHL 297-98, 301.   As with the July 14, 2004 initial denial of Plaintiff's claim, the Court concludes Defendant's August 18, 2004 appeal denial is without appropriate evidentiary support.

Per Defendant's referral instructions, Dr. Wortman's report explains that his fatigue opinion is based on "the clinical information provided." AHL 300-01. He additionally notes: "There is no objective evidence to support [Plaintiff's] claim of mental and physical fatigue." *Id.* at 301. Dr. Wortman also adds: "As an aside, it appears that depression may be playing a significant role in his illness." *Id.* Regarding his conversation with Dr. Monsour, Dr. Wortman states: "He had no opinion as to [Plaintiff's] continued fatigue." *Id.* With respect to Plaintiff's xerostomia, Dr. Wortman notes that it "will continue to be a problem," but concludes that "aside from carrying water on a chronic basis and practicing strict oral hygiene, it should not influence his ability to perform." *Id.*

Defendant's reliance on Dr. Wortman's report in denying Plaintiff's appeal is problematic for reasons similar to those applicable to the July denial and its reliance on Dr. Gannet's report. With respect to Plaintiff's xerostomia, Dr. Wortman reasons only that Plaintiff can speak in full sentences and carry on a normal conversation. AHL 301. Thus, the significant issue of Plaintiff's ability to speak for prolonged periods is not addressed by him and, accordingly, Defendant.

Regarding Plaintiff's continued fatigue, Dr. Monsour's purported lack of opinion, when considered in the context of his repeated written assertions of Plaintiff's fatigue, can only mean, as previously suggested in connection with Dr. Gannet's remarks, that Dr. Monsour voiced no specific opinion as to why Plaintiff's radiation therapy would still be causing him to suffer severe fatigue. AHL 406-07, 473, 475, 584, 846, 848, 850. As for Dr. Wortman's comment that "it appears that depression may be playing a significant role in his illness," which he offered "as an aside," AHL 301, the Court notes that Dr. Monsour, Plaintiff's treating physician, never recorded any suspicion of depression or malingering by Plaintiff, or referred him for a psychological evaluation. Nor is depression or possible malingering referenced in either of Defendant's denial letters as the basis of the denial. AHL 297-98, 332-33. In any event, to the extent that disabling depression resulted from

Plaintiff's cancer treatment and recovery, Defendant has not demonstrated that that particular side effect was excluded by its policy.[27]

The lack of objective evidence to support Plaintiff's claim of fatigue that is referenced in Dr. Wortman's report, and apparently given particular emphasis by Defendant, is likewise problematic once again.  Obvious external signs of severe fatigue, resulting from an extended period of sustained activity, are something that a treating physician may or may not have the opportunity to actually observe first-hand during a routine office visit.  Nor is such fatigue easily proven by reference to test results typically found in a patient's medical records.

Further, as previously discussed, Defendant's policy language does not expressly include an "objective evidence" requirement in its proof of claim section.  Significantly, moreover, Defendant did not explain, as it should have, in its July 14, 2004 denial letter, or its July 21, 2004 response to Plaintiff's request for a copy of the administrative record,[28] that Plaintiff's claim was being denied because of the absence of objective evidence of his fatigue.  *See* 29 C.F.R. § 2560.503-1(g)(1); *see also* "Claim Review" provisions of Defendant's Policy, AHL 032.[29]  Nor, for example,

---

[27]    The report of the first reviewing physician, Dr. Bender, suggests that "complicating factors including depression, significant weight loss, motivation, etc. must also be considered as affecting" his estimates of the appropriate recovery time from radiation therapy.  AHL 596.  It is undisputed that weight loss is a common side effect of radiation, and that Plaintiff initially suffered weight loss of at least thirty pounds as a result of his radiation therapy.   Otherwise, reliance on Dr. Bender's suggestions of depression or questionable motivation  would be subject to the same criticisms as Dr. Wortman's depression comment.

[28]    Defendant's July 21, 2004 letter confusingly states: " The appeal request . . . should include documentation that supports your position, as well as information not previously reviewed." AHL319.

[29]    The language of the "Claim Review" provisions of Defendant's policy are set forth on page 19 of this Order and Reasons.  The cited regulation, 29 C.F.R. §2560.503-1, provides, in pertinent part:

did it indicate that a functional capacity evaluation, or some other specified means of objectively

evaluating Plaintiff's symptoms, was needed or would be appropriate.  *Id.*  Given these omissions,

and the otherwise conclusory nature of the denial letter, Plaintiff was not sufficiently notified of the

reasons for the denial and, thus, was hindered in presenting such evidence.

---

(g)  Manner and content of notification of benefit determination.

(1) Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide  a claimant with written or electronic notification of any adverse benefit determination. [] The notification shall set forth, in a manner calculated to be understood by the claimant –

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,

(A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

(B) If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

Compounding the problem, Defendant essentially disregarded the notice provided in Plaintiff's appeal letter that the objective evidence that Defendant *had* relied on – the video surveillance – was incomplete, and given much more significance than warranted.  In his appeal letter, Plaintiff, as previously stated, attempts to cure any existing uncertainty regarding the disabling nature of his fatigue.  AHL1122.   He explains that it is  "after several hours of exertion," that he "become[s] completely fatigued and need[s] to rest."  *Id.*   He further contests the lifting capacity assessments made by Dr. Gannet, as well as certain conclusions drawn from the surveillance.  *Id.* Specifically, regarding the latter, he contends that the seats of his SUV "weigh as much as a floatation device," and indicates that he takes two naps a day and goes to bed at 7:00 p.m. *Id.*  Neither Dr. Wortman's report, nor Defendant's denial letter, however, expressly addresses Plaintiff's contentions in any way.

Making matters worse, Defendant rendered its appeal denial decision *before* receiving additional information that Plaintiff's counsel, once retained, gave notice would be coming in connection with Plaintiff's appeal. AHL 121-22. Specifically,  as outlined above, Plaintiff's counsel informed Defendant by letter, on August 2, 2004, of his representation of Plaintiff.  *Id.*  He further advised that Plaintiff would be having a functional capacity assessment, and that he wanted to file that report into the administrative record.  *Id*.  Finally, he advised that, given Dr. Gannet's review, Dr. Monsour had been asked to provided a supplemental report. *Id.*   Despite this notice and that the sixty-day appeal period had not yet passed, Defendant rendered its adverse appeal decision on August 18, 2004, without inquiring as to whether Plaintiff still intended to submit additional information. AHL  297-98.

In conclusion, regarding both the July and August 2004 denials, the Court recognizes that an ERISA claimant bears the burden of demonstrating his entitlement to benefits provided by

a disability insurance plan. Further, the Fifth Circuit has declined to *impose* a duty to "conduct a reasonable investigation" on administrators. *Vega*, 188 F.3d at 297-99. Nevertheless, claim determination measures that *are* undertaken by administrators must be conducted carefully, and in a reasonable, fair, and deliberative manner. An administrator cannot compile and rely upon evidence that is tangential and/or not truly pertinent to an insured's claim, or essentially ignore evidence favorable to a claimant without further inquiry. Nor can it rest its claim decisions on unsupported suspicions. *Vega*, 188 F.3d at 297-99. To the contrary, the administrator's determination must have a rational connection to the relevant evidence before it. *Id.* Similarly, a claimant is effectively deprived of his right to appeal if he is left to guess at the reasons for a claim denial and, relatedly, the type of evidence necessary to fulfill the applicable proof of claim requirements. In short, the deference granted an insurer given discretion under an ERISA plan is not intended to result in only the most savvy and resourceful insureds, or those with counsel, being able to successfully support a claim for benefits.

c.   <u>September/October 2004 Claim Denial</u>

The Court turns now to additional documentation that Plaintiff provided in support of his claim following Defendant's August 18, 2004 denial of his appeal. This information, which was provided on September 1, 2004, was Dr. Monsour's August 5, 2004 letter and Ms. Smith's August 24, 2004 "Functional Capacity Evaluation." AHL 1266-85. As previously explained, Defendant contends that the Court should not consider any evidence submitted by Plaintiff after August 18, 2004. Defendant reasons that Plaintiff, by objecting to an independent medical examination, precluded it from "fully investigating" his condition and, therefore, failed to exhaust his administrative remedies. The Court disagrees. This evidence, which is supportive of Plaintiff's claim, is appropriately considered by the Court.

32

i.   Propriety of Considering Post-August 18, 2004 Evidence

Defendant is correct that, under controlling case law, a plaintiff may not bring a suit for ERISA benefits prior to exhausting his administrative remedies.  *See, e.g., Denton v. First Nat'l Bank of Waco Tex.,* 765 F.2d 1295, 1297 (5th Cir. 1985).  This includes completion of administrative appeal remedies.  *See, e.g. United Healthcare Ins. Co. v. Levy*, 114 F. Supp. 2d 559, 565 (N.D. Tex. 2000) (citing *Brock v. Primedica, Inc.*, 904 F.2d 295, 297 n.2 (5th Cir. 1990)).  Accordingly, an insured's refusal to submit to an independent medical examination, without a reasonable excuse, will preclude receipt of benefits under a disability plan.  *See, e.g., Acierno v. First UNUM Life Ins. Co.,* No. 98-3885 S J, 2002 WL 1208616, *2 (E.D. New York  Mar. 31, 2002).  Under the specific circumstances presented in this particular case, however, the Court does not find Plaintiff's October 5, 2004 objection to submitting to an independent medical examination to have been unreasonable. Consequently, it does not preclude Plaintiff's receipt of benefits, or, as Defendant has requested, warrant limiting the Court's review to only the evidence found in the administrative record as of August 18, 2004.

Defendant now vigorously argues that the lack of an independent medical examination "denied it the opportunity to fully investigate," "deprived it of valuable insight," and leaves Defendant in a position of "not know[ing] whether Plaintiff is disabled."  *See*  Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Rec. Doc. No. 17) at 6; American Heritage's Supplemental Memorandum in Support of Motion for Summary Judgment (Rec. Doc. No. 36) at 4;  American Heritage's Reply Brief to Supplemental Memorandum in Support of Plaintiff's Motion for Summary Judgment (Rec. Doc. No. 43) at 2.  The reality of the situation, however, is that, prior to the time Defendant requested an independent medical examination, it had already denied Plaintiff's claim for renewed benefits *twice* and sent Plaintiff's file for peer physician

review *three* times.  In short, if Defendant truly needed another physician to have the opportunity to physically examine Plaintiff, rather than just review his records and talk to his treating physician, it seems that this already would and should have been indicated.

Defendant, however, seeks to highlight the contents and/or nature of Dr. Monsour's August 5, 2004 report and the Smith report as justification for its belated request for an independent medication examination.  Dr. Monsour's August 2004 report, however, offers no *newly* significant information.  Rather, it essentially updates that which was previously submitted.[30]  AHL 1266.

As for the Smith report, it *was* the first functional capacity assessment provided by Plaintiff in support of his claim.  Again, however, Defendant had never previously informed Plaintiff that, given the nature of his claimed disabilities, and the absence of objective evidence of severe fatigue in his medical records, a functional capacity assessment would be necessary to establish his inability to perform his material and substantial job duties.  This omission is significant, given the peer review physicians' emphasis on the lack of objective evidence, and Defendant's own reliance on the very limited (and inconclusive) objective evidence provided by the surveillance video.

Even more important, Defendant does not explain why Plaintiff's submission of a functional capacity evaluation necessarily would render a medical examination, rather than just its own counter functional capacity evaluation of Plaintiff, appropriate.  Significantly, Plaintiff offered no objection to such an assessment.  AHL098.

Furthermore, as the Court has noted, Defendant decided to end its review of Plaintiff's

---

[30]     In its latest briefing, Defendant emphasizes   Dr. Monsour's reference to continued monitoring for metastatic disease. *See* American Heritage's Reply Brief to Supplemental Memorandum in Support of Plaintiff's Motion for Summary Judgment (Rec. Doc. No. 43) at 2. Dr. Monsour, however, had made similar statements in earlier reports, *e.g.*, his June 22, 2004 letter, that Defendant apparently never determined merited an IME.  AHL 475, 585.

appeal and, on August 18, 2004, to issue a denial decision, despite having been previously notified that Plaintiff intended to supplement his appeal submission with a functional capacity evaluation report and an updated report from Dr. Monsour, and knowing that it had not yet received this information.  Given Defendant's advance notice of this information, it could have chosen to forego a third physician file review and instead sought an independent medication examination and a functional capacity evaluation prior to rendering a final decision.  Or, even if Defendant  had continued with Dr. Wortman's review, it could have delayed a final decision on the necessity of an independent medical examination and/or functional capacity evaluation, as well as the merits of the appeal itself, until it had received and reviewed the additional documentation.

       If Defendant had chosen either of these options, and determined that an independent medical examination was needed *prior* to making a determination of Plaintiff's appeal, Plaintiff would have a much more difficult time justifying his objection to an independent medical examination.  Instead, Defendant chose to proceed with only a third peer physician review of Plaintiff's record.  Then, once that report was obtained, Defendant promptly denied the appeal only 16 days after Plaintiff's counsel had provided notice of his intent to supplement the earlier submission made by Plaintiff *pro se,* and well before the expiration of the 60-day appeal period.

       Finally, a careful review of Defendant's October 5 and 15, 2004 correspondence indicates that, at the time Defendant communicated that it was "left with no option but to discontinue the [post-appeal denial] review process and close Mr. Servat's file,"  it had not yet even determined that an independent medical examination actually would  be necessary. AHL 94-95, 126.  Rather, Defendant initially referred Plaintiff's file and the Smith report for an "independent vocational assessment," and stated that an independent medication examination would be arranged "*if* indicated."   AHL 94-95, 126 (emphasis added).

It is true that Mr. Violetta recommended a review of the Smith report by a physical therapist, occupational therapist, or physiatrist for reliability, when he ultimately rendered his independent vocational assessment report on October 26, 2004.  AHL 274.  He also suggested that Defendant consider an independent medical examination as part of a functional capacity assessment so as to establish Plaintiff's work limitations more clearly and to allow for clinical observation of Plaintiff's xerostomia. *Id.*  Mr. Violetta's recommendations, however, occurred *after* Defendant had already terminated its review of Plaintiff's claim, and *after* Defendant had had numerous earlier opportunities to reasonably demand Plaintiff submit to an independent medical examination and/or a functional capacity examination.  The record, moreover, reflects no effort by Defendant to offer Mr. Violetta's report, upon its receipt, to Plaintiff as justification for a renewed request for an independent medical examination.

Given the totality of the foregoing circumstances, the Court does not find it appropriate to forego any consideration of the materials made part of the administrative record after August 18, 2004.  The general requirement that an ERISA claimant exhaust his administrative remedies, including, when reasonable, undergoing an independent medical examination, is intended to ensure that plan administrators have sufficient opportunity to properly and effectively evaluate and act upon claims before being forced into litigation.  They are not, however, intended to require deserving claimants to suffer repeated claim reviews of a general sort, as well as multiple resulting claim denials, only to then essentially start the review process over when the administrator belatedly decides upon the specific type of evidence that the beleaguered claimant *really* needs to provide.  The post-denial exhaustion argument here serves only to place an additional burden at the courthouse door for a claimant who has already complied with ERISA's requirements up through and beyond denial of his appeal.

36

ii.   Significance of the Evidence Submitted After August 18, 2004

Pertinent evidence included in the administrative record of Plaintiff's claim after August 18, 2004 – Dr. Monsour's August 5, 2004 letter, the August 26, 2004 Smith report, *and* Mr. Violetta's October 26, 2004 report – further demonstrates the inadequate evidentiary support for Defendant's denials of Plaintiff's claim for disability benefits.  Specifically, Dr. Monsour's letter confirms that, as a result of his radiation, Plaintiff still suffers xerostomia and severe fatigue that prevent him from doing his normal daily activities without prolonged periods of rest.  AHL1266. He further opines that Plaintiff's condition will persist for some time into the future.   *Id.*

With respect to the Smith report, the Court, being aware of Mr. Violetta's criticisms thereof, is somewhat unsure of the relevance of certain of the physical activities utilized to demonstrate and measure Plaintiff's progressive fatigue.  That being said, the report does provide some objective evidence of the disabling effects of Plaintiff's fatigue and xerostomia.  AHL 1267-85. From her evaluation, Ms. Smith opines that the combination of fatigue and xerostomia rendered Plaintiff presently unable to meet the demands of his work, and that the xerostomia alone prevented him from fulfilling the speaking requirements of his job.   AHL 1273.

Significantly, although Mr. Violetta surmised, after reviewing the Smith report, that Plaintiff should at least be able to sustain *sedentary* work on a full-time basis, he additionally indicated, in his report, that Plaintiff's regular occupation exists at a *light* exertional level and requires "constant speaking." AHL 273-74.[31] Further, though Mr. Violetta suggested that the Smith evaluation's methodology and findings be reviewed for reliability, and that a functional capacity

---

[31]     As reflected in the policy language set forth on page17-18 of this Order and Reasons, Plaintiff's disability status, as of July 14, 2004, turned on his ability to perform the material and substantial duties of *his* regular occupation, rather than just any gainful occupation.  AHL 027.

evaluation, as part of an independent medical examination, be considered to establish work capacity more clearly, and to allow for clinical observation of Plaintiff's xerostomia, he agreed that an inability to speak for prolonged periods of time would render Plaintiff incapable of performing his own occupation. *Id.* at 273-75.[32]

### 3.   Amount of Benefits Owed

Although the Court has determined that Defendant's denial of Plaintiff's claim for long - term disability benefits was in error, the parties' submissions do not provide sufficient information for the Court to determine the exact dollar amount of benefits owed.  Accordingly, the parties are to confer and, if possible, file a joint submission, on or before September 12, 2007, outlining the  amount of unpaid benefits minus any appropriate deduction for Social Security disability benefits.  If the parties cannot agree on these figures, each is to submit its proposed calculation, as well as a short supporting memorandum of no more than eight (8) pages, on or before September12, 2007.  These memoranda should concisely brief the issues preventing the parties from stipulating to the  appropriate dollar amounts for these awards.  These memoranda, however, are <u>not</u> to re-visit the issues determined in this Order and Reasons.

### II.   Plaintiff's Claim for Attorney Fees

In addition to seeking an award of disability insurance benefits, Plaintiff additionally requests an award of attorney's fees and costs pursuant to 29 U.S.C. §1132(g)(1).[33]  As explained

---

[32]   As stated in footnote 8,  Mr. Violetta's report notes that both Ms. Smith and Dr. Monsour have clinically observed Plaintiff's xerostomia.  AHL 274.

[33]   The heading of this section of Plaintiff's memorandum (Rec. Doc. No. 12) is entitled "Attorney's Fees and Pre-Judgment Interest."  Entitlement to pre-judgment interest, however, is not briefed by either party.  Accordingly, the Court considers only a request for attorney's fees and costs to be before it.

by the Fifth Circuit in *Kennedy v. Plan Adminr. for Dupont Savings and Inv. Plan,* ____ F.3d ____,

2007 WL 2317628, *6 (5th Cir.):

> [I]n deciding whether to award fees, a district court applies the test
> stated in *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255 (5th
> Cir.1980), which examines the following factors (*Bowen* factors):
> (1) the degree of the opposing party's culpability or bad faith; (2) the
> ability of the opposing party to satisfy an award; (3) whether an
> award would deter others acting under similar circumstances; (4)
> whether the requesting party sought to benefit all participants and
> beneficiaries of an ERISA plan, or to resolve a significant question
> regarding ERISA; and (5) the relative merits of the parties' positions.
> *Id.* at 1266.

Considering these factors as applied to the instant case, the Court finds that all of them, with the

exception of the fourth factor, weigh in Plaintiff's favor.

Although resolution of this matter might have been easier and faster if Plaintiff had

undergone an independent medical examination when it was first mentioned by Defendant, or at least

prior to filing suit, the Court, for the reasons stated, does not find that to have been absolutely

necessary on the facts presented.  On the other hand, the Court is convinced that Defendant

improperly denied Plaintiff's requests for benefits, given the evidence before it,  failed to adequately

explain its reasons for its denial, failed to fairly explain the type of information required to prove a

claim under its policy, and inappropriately terminated its last review of Plaintiff's claim.  There is

no indication that Defendant is incapable of satisfying an award of reasonable attorney's fees.

Finally, rendering an award of attorney's fees in this case may cause other insurers to improve upon

similar claim review processes to the benefit of many insureds.  Accordingly, Plaintiff's request for

an award of fees and costs is granted.

Plaintiff is to submit an accounting of fees and costs expended in this matter and a

brief memorandum supporting the propriety of the amounts requested on or before September 12,

2007.   Any opposition from Defendant shall be submitted within seven (7) working days from the date Plaintiff's accounting and memorandum are submitted.

## CONCLUSION

For the reasons stated herein, the Court finds that Defendant's denials of Plaintiff's 2004 claim for renewed long-term disability benefits are not adequately supported by the administrative record and, therefore, constitute an abuse of discretion. This is true even if only evidence submitted prior to August 18, 2004, is considered.   The Court does not find it appropriate, however, to exclude the post-August 18, 2004 evidence from its consideration.  Additionally, given the specific circumstances presented, the Court finds that an award of attorney's fees and costs, pursuant to 29 U.S.C. §1132(g)(1).  Further submissions by the parties, as detailed herein, will be necessary for the Court to determine the exact amount of unpaid benefits, attorney's fees, and costs that are owed.

New Orleans, Louisiana, this  28th  day of August 2007.

_____
**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**